IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

ANTONIO SANTANA VARGAS,

    **Plaintiff,**

        v.                                CIVIL NO. 15-1521 (JAG)

SANTANDER FINANCIAL SERVICES, INC., *et al.,*

    **Defendants.**

## OPINION AND ORDER

GARCIA-GREGORY, D.J.

This case is about inadequate supervision, economic downturns, unsatisfactory performance, and the general ups and downs of the workplace in corporate America. This case is not, however, about discrimination based on age.

Before this Court is Defendant Santander Financial Services, Inc.'s ("Santander Financial"), Motion for Summary Judgment, Docket No. 89, Plaintiff Antonio Santana Vargas's ("Mr. Santana" or "Plaintiff") Opposition to Summary Judgement, Docket No. 127; Santander Financial's Reply to the Opposition, Docket No. 139; and Mr. Santana's Sur-reply, Docket No. 154. For the reasons stated below, Santander Financial's Motion for Summary Judgment is **GRANTED**.

## STANDARD OF REVIEW

A motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A fact is in genuine dispute if it could be resolved in favor of either party,

CIVIL NO. 15-1521 (JAG)                                                                          2

and it is material if it potentially affects the outcome of the case. *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986)).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Once the moving party has properly supported [its] motion for summary judgment, the burden shifts to the nonmoving party . . . ." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (quoting *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997)). However, "[i]f further 'inquiry into the facts is . . . desirable to clarify the application of the law,' summary judgment is not appropriate." *Crowe v. Examworks, Inc.*, 136 F. Supp. 3d 16, 26-27 (D. Mass. 2015) (citing *Mandel v. Bos. Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006)).

In evaluating a motion for summary judgment, the Court must view the entire record "in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." *Winslow v. Aroostook Cty.*, 736 F.3d 23, 29 (1st Cir. 2013) (quoting *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000)). The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 134 (1st Cir. 2013) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)). Throughout this process, courts cannot make credibility determinations or weigh the evidence, as these are jury functions and not those of a judge. *See Liberty Lobby*, 477 U.S. at 255; *Garcia-Gonzalez v. Puig-Morales*, 761 F.3d 81, 99 (1st Cir. 2014) (internal citations omitted).

Local Rule 56(b) requires that the movant submit a statement of material facts to which said party contends there is no genuine issue of material fact. In accordance with Local Rule 56(e), the Court only credits facts properly supported by accurate record citations. Statements of fact

CIVIL NO. 15-1521 (JAG)                                                                                    3

"may not include legal arguments or conclusions . . . ." *Cruz-Acevedo v. Toledo-Dávila*, 660 F. Supp. 2d 205, 209 (D.P.R. 2009). Thus, the Court disregards all argumentative and conclusory allegations, speculations, and improbable inferences disguised as facts. *Forestier Fradera v. Municipality of Mayaguez*, 440 F.3d 17, 21 (1st Cir. 2006); *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

Additionally, answers to interrogatories used to support or oppose a statement of fact are subject to the same infirmity as affidavits, and must comply with Fed. R. Civ. P. 56(c)(4) insofar as they must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-50 (1st Cir. 1990); *Hoffman v. Applicators Sales and Serv., Inc.*, 439 F.3d 9 (1st Cir. 2006).

"In deciding which parts of an affidavit are admissible at the summary judgment stage, 'personal knowledge is the touchstone.'" *Navedo v. Nalco Chem., Inc.*, 848 F. Supp. 2d 171, 179 (D.P.R. 2012) (citing *Perez v. Volvo Car Corp.*, 247 F.3d 303, 315 (1st Cir. 2001)). To establish personal knowledge, "a bare assertion that a statement is based on the affiant's personal knowledge will not suffice; rather, the affidavit must be factually specific and explain the basis for that knowledge." *Navedo*, 848 F. Supp. 2d at 179 (citation omitted). In addition, "the requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise." *Velez v. Marriot PR Management, Inc.*, 690 F. Supp. 2d 235, 250 (D.P.R. 2008) (citing *Perez*, 247 F.3d at 316 (1st Cir. 2001)). Although self-serving affidavits may be used for summary judgment, they are deemed insufficient if they "neither contain *enough specifics nor speak meaningfully* to matters within [the affiant's] personal knowledge."). *Cadle Co. v. Hayes*, 116 F.3d 957, 961 n.5 (1st Cir. 1997) (emphasis added).

CIVIL NO. 15-1521 (JAG)                                                                 4

The Court has disregarded all statements of fact that do not comply with these standards, and makes the following findings of fact:

## FINDINGS OF FACTS[1]

I.   **Parties**

1.   Santander Financial is a for-profit company organized under the laws of Puerto Rico, and provides financial services in Puerto Rico. It has over 500 employees and has an equal opportunity employer policy. Docket Nos. 89-2 at 1; 105-1 at 1; 139-2.

2.   Banco Santander is a for-profit company duly organized under the laws of Puerto Rico, and provides banking and financial services in Puerto Rico. It has over 1,500 employees and has an equal opportunity employer policy. Docket No. Docket Nos. 89-2 at 1; 105-1 at 1; 139-2.

3.   Mr. Santana worked at Island Finance since June 30, 1986. Docket Nos. 89-14 at 2-3; 89-2 at 2.

4.   In 2006, Santander Financial acquired Island Finance. Docket Nos. 89-2 at 2; 105-24 at 10.

5.   After the acquisition, Mr. Santana became an employee of Santander Financial effective March 1, 2006. Docket Nos. 89-14 at 2-3; 105-19.

6.   Mr. Santana's seniority at Island Finance was not affected by the acquisition and his initial employment date continued to be June 30, 1986. Docket No. 105-19.

---

[1] The Court made the following finding of facts pursuant to the applicable Federal Rules of Civil Procedure and the Federal Rules of Evidence. Many facts did not make the cut as they were either not supported by the record, adequately controverted, or were not properly cited.

7. Due to Puerto Rico's economic recession, Island Finance and Santander Financial have had to reduce the number of branches. Docket No. 127-5 at 14.

## II.  Banco Santander's and Santander Financial's Relationship

8. Banco Santander and Santander Financial created "Regulation W", which establishes the services that one company is to provide the other. Docket Nos. 105-22 at 12-14; 105-24 at 7.

9. Banco Santander provides human resources services to Santander Financial. Docket No. 105-24 at 2.

10. Banco Santander and Santander Financial are located in the same building. Docket No. 127-5 at 13.

11. Santander Financial uses and gives its employees Banco Santander's Employee Manual and Rules of Conduct ("Employee Manual"). Docket Nos. 105-1; 89-14 at 17; 105-22 at 12.

12. Warnings and disciplinary actions to Santander Financial employees are revised and approved by Banco Santander's Human Resources Department. Docket No. 127-5 at 6-7.

13. Banco Santander's Subdirector of Human Resources has the power to terminate the employment of a Santander Financial employee with the approval of said employee's supervisor. Docket No. 127-5 at 8.

14. Banco Santander's Human Resources Department determines the salary and salary increases of Santander Financial employees. Docket No. 127-5 at 6.

15. Banco Santander and Santander Financial use the same payroll system. Docket No. 127-5 at 5.

CIVIL NO. 15-1521 (JAG)                                                                6

16. Banco Santander's name does not appear on Santander Financial's employees paychecks. Docket No. 89-14 at 12.

III.   **Mr. Santana's Duties and Responsibilities**

17. Mr. Santana held the position of branch manager for approximately fourteen years, being given the position in 2001 by Island Finance. Docket No. 127-3 at 1; 89-2 at 2.

18. In 2006, Mr. Santana retained his title of branch manager after Santander Financial's acquisition of Island Finance. Docket No. 105-19.

19. Mr. Santana occupied the position of branch manager for the Ciales and Utuado branches. Docket No. 89-14 at 15.

20. At the time of his termination, Mr. Santana was the branch manager of the Island Finance's Utuado branch. Docket No. 127-6 at 21.

21. As branch manager, Mr. Santana supervised the branch's employees and ensured that they complied with their position's duties and responsibilities as well as Santander Financial's rules and procedures. Docket Nos. 89-14 at 16; 105-9 at 2.

22. Mr. Santana had to oversee the branch's achievement of sales and collection goals established by Santander Financial. Docket No. 105-9.

23. Mr. Santana received and signed a Responsibilities Manifest, dated February 2, 2012 sent by Mario Enrique Delgado Mateu ("Mr. Delgado"), president of Santander Financial. Docket No. 105-9.

24. The Responsibilities Manifest went over the responsibilities of his position as manager of an Island Finance branch. Docket No. 105-9.

25. The Responsibilities Manifest established that Mr. Santana had to achieve the goal of sales at the branch within the volume of business that is expected and ensure this goal by increasing accounts. Docket No. 105-9 at 1.

26. As part of the competencies and critical factors for success as a manager, he or she must consistently achieve results that create value aligned with the enterprise's strategy; take quick and decisive action before unexpected situations demonstrating perseverance, tenacity and determination; and establish priorities that anticipate and minimize risks, achieve quality results and efficient and effective way. Docket No. 105-9 at 2.

IV.     **Santander Financial's Policies and Procedures**

27. Santander Financial has a set of human resources policies, which include a policy against discrimination, harassment and retaliation. Docket No. 89-14 at 17.

28. Santander Financial has a procedure for reporting any perceived discrimination, harassment and retaliation. Docket No. 89-14 at 18.

29. Among the rules and procedures that must be complied with are:

    a.  Norm 9: Comply with the internal and external requirements of the Quality Customer Service Program, internal and external. Docket No. 105-1 at 11.

    b.  Norm 27: Deficiency, neglect and/or lack of compliance with your responsibilities of your functions will not be permitted. Docket No. 105-1 at 20.

    c.  Norm 29: Carrying out the duties assigned to your position and/or by your supervisor; or performing them with the greatest interest, responsibility and efficiency; competency, loyalty, honesty, and obedience; complying with the rules

and orders imparted by your supervisor; following the norms and instructions in

effect, whether they are written or oral. Docket No. 105-1 at 21

30. Mr. Santana received the Santander Financial's Employee Manual. Docket No. 89-14

at 17.

## V. Previous Disciplinary Actions and Evaluations

31. On April 15, 2009, Mr. Santana received and signed a memorandum, which outlined

his results as manager of the Ciales Island Finance branch for the first trimester of

2009. Docket No. 105-10.

32. The April 15, 2009 memorandum states that the Ciales branch results were not

acceptable and that it compromised Mr. Santana's permanence in his position. Docket

No. 105-10.

33. The memorandum also indicated that Mr. Santana was to ask for assistance should he

needed it and his supervisor at that time, Efraín Alicea, would provide it. Docket Nos.

89-14 at 30; 105-10.

34. Before Mr. Santana's arrival as the Ciales' branch manager in 2009, the branch had

numerous fraudulent operations in the process of approving loans and monetary

losses. Docket No. 127-4 at 28.

35. On August 16, 2010, Mr. Santana received and signed another memorandum, which

outlined his results as manager of the Utuado Island Finance branch for the second

trimester of 2010. Docket Nos. 89-14 at 31-32; 105-11.

36. The August 16, 2010, memorandum states that the Utuado Branch's marginal results

were not acceptable and that these compromised Mr. Santana's permanence in his

position. Docket No. 105-11.

37. When Mr. Santana was assigned to the Utuado branch in 2010, the branch had low production numbers and did not have manager before his arrival. Docket No. 127-4 at 29-30.

38. In 2010, Mr. Santana was placed on his first Performance Improvement Plan ("PIP") for ninety days. Docket Nos. 127-4 at 29-30; 105-11 at 2.

39. Mr. Santana received a performance evaluation for 2011. Docket Nos. 89-14 at 33; 111-1.

40. Santander Financial evaluates an employee's performance using a one to five point system (five being the highest one being the lowest). Docket No. 89-14 at 39.

41. Mr. Santana's evaluation for his 2011 performance had a final result of 2.05, which is considered to be "Next", a tier lower than "Expected." Docket No. 111-1.

42. Mr. Santana answered on the form that he reviewed the evaluation with his supervisor and marked that he agreed with the evaluation. Docket Nos. 111-1; 89-14 at 34-35.

43. Mr. Santana received and discussed a draft performance evaluation for 2012. Docket Nos. 89-14 at 38-39; 105-13.

44. Mr. Santana's evaluation for his 2012 performance has a final result of 2.31, which is considered to be partially meets or complying. Docket Nos. 89-14 at 38-41; 105-12; 105-13.

45. The 2012 draft performance evaluation states that there are several areas in which Mr. Santana needs improvement. Docket No. 105-13.

46. Mr. Santana received a performance evaluation for 2013. Docket Nos. 89-14 at 42; 105-14.

47. Mr. Santana's evaluation for his 2013 performance had a final result of 2.39, which is considered to be partially meeting or complying. Docket Nos. 105-12; 105-14.

CIVIL NO. 15-1521 (JAG)                                                                 10

48. As stated in his evaluation, Mr. Santana knew that he had to work on team development and in the sales of insurance policies and mortgage products. Docket Nos. 89-14 at 43; 105-14.

49. Mr. Santana discussed the evaluation with his direct supervisor. Docket Nos. 89-14 at 44; 105-14.

50. Mr. Santana agreed with his 2013 evaluation. Docket 105-14.

51. In December 2013, Mr. Santana was sent to Commercial School in order to assist him in fulfilling his duties. Docket Nos. 105-8; 105-24 at 16.

## VI.   Plaintiff's Complaints and Requests

52. In 2010, Mr. Santana requests resources and additional employees to correct the Utuado branch's low production numbers. Docket No. 127-4 at 29-30.

53. On May 16, 2013, Mr. Fredy Molfino, Island Finance's president, asked him to resign and that he would consider giving him an auditor position. Docket No. 127 at 16-17.

54. On May 22, 2013, Mr. Santana speaks to Marilyn Guzman ("Ms. Guzman") from Human Resources Department to express that he was not going to resign as branch manager. Docket No. 127-4 at 10-13.

55. Later in 2013, Mr. Santana filed a verbal complaint to Ms. Guzman that pertained to Freddy Molfino's, Santander Financial president comments. Docket 127-4 at 12-14.

56. Mr. Santana's complaint did not involve any age related comments. Docket 89-14 at 13.

57. On April 4th, 2014, Mr. Santana spoke to his direct supervisor, regional manager Virgen Mejias ("Mejias"), and explained that he needed support in human resources and changes to personnel. Docket No. 127-4 at 31-35.

CIVIL NO. 15-1521 (JAG)                                                              11

58. Mr. Santana also requested that Brenda Marengo ("Ms. Marengo"), an employee who had been transferred to another branch, be reassigned back to the Utuado Branch's collections department. Docket No. 139-7 at 6-7.

59. Ms. Marengo was transferred to the Arecibo branch after a domestic violence incident in the Utuado branch. Docket No. 116-8 at 7.

60. Ms. Marengo was not reassigned back to the Utuado branch. Docket No. 139-7 at 6-7.

61. On April 28th, 2014, Mr. Santana spoke to Ms. Mejias and explained that he needed support in human resources and changes to personnel. Docket No. 127-6 at 24-25.

62. On June 5, 2014, Mr. Santana met with Ms. Mejias and the new Commercial Director, Martin Pagani ("Mr. Pagani"), to explain the personnel issues that the Utuado Branch had. Docket No. 127-6 at 25.

63. Mr. Santana asked that Ms. Mejias and Mr. Pagani to transfer Lucy Torres ("Ms. Torres") to another branch. Docket No. 127-6 at 25.

64. Ms. Mejias and Mr. Pagani informed Mr. Santana that if they transferred Ms. Torres, another employee, Joely Rosado, would also be transferred. Docket No. 127-6 at 25.

65. On June 30th, 2014, Mr. Santana expressed to Ms. Mejias what was needed to improve the branch's numbers. Docket No. 127-6 at 25.

VII.     **Mr. Santana's Performance Improvement Plan**

66. A PIP is a process established with the purpose of improving an employee's marginal or unsatisfactory performance. Docket Nos. 105-1 at 3; 105-22 at 11.

67. During a PIP, the employee's supervisor would discuss the evaluation with the employee in a monthly basis and an action plan would be established. Docket No. 105-1 at 5.

CIVIL NO. 15-1521 (JAG)                                                                                           12

68. In March 2014, Mr. Santana was placed in a PIP for failure to meet the established objectives for his position. Docket Nos. 89-14 at 47; 105-12.

69. Mr. Santana's expected performance was to surpass a score of 2.65 in his performance evaluation. Docket No. 105-12.

70. Mr. Santana received a letter dated March 21, 2014, which confirms that he was being placed in a PIP. Docket Nos. 89-14 at 46-48; 105-12.

71. On April 4, 2014, Mr. Santana signed the letter containing the PIP and his evaluation until that date, indicating that he received, read and understood its contents. Docket Nos. 89-14 at 46-48; 105-12.

72. Mr. Santana discussed the letter with Ms. Mejias and verbally communicated he was not in agreement with the letter. Docket Nos. 89-14 at 47-48.

73. The March 21, 2014 letter states that Mr. Santana's performance deviates from Norm 27 of the Employee Manual and that he must work to comply with that norm. Docket No. 105-12.

74. The letter also conveys that Mr. Santana would be notified of any workshops or seminar trainings that he could participate in. Docket No. 89-14 at 48-49; 105-12.

75. The letter also states that Mr. Santana will be monitored monthly for six months. Docket No. 105-12.

76. Mr. Santana was not provided with the work plan Mr. Guzman sent to Ms. Mejias concerning the 2014 PIP. Docket Nos. 127-4 at 36; 127-8.

77. At the time of the 2014 PIP, there were no workshops or seminar trainings available for Mr. Santana to participate in. Docket Nos. 127-9 at 4; 127-11 at 2.

78. Mr. Santana did not request any workshop or seminar be provided. Docket Nos. 89-14 at 49; 139-4 at 17-18.

79. On April 7, 2014, Mr. Santana met with Ms. Mejias to discuss the 2014 first trimester results for the Utuado branch. Docket Nos. 89-14 at 49-50; 105-21.

80. Mr. Santana signed a letter on April 28, 2014 confirming he attended the April 7th meeting. Docket No. 105-21.

81. The letter states that the Utuado branch received a result of 89.9%, which is below of what was expected. Docket No. 105-21.

82. The letter also stated that Mr. Santana was not complying with Norms 9, 27 and 29 of the Employee Manual. Docket No. 105-21.

83. On April 22, 2014, Mr. Santana also signed a monthly follow-up of the PIP for the month of March 2014. Docket No. 105-15.

84. The monthly follow-up placed Mr. Santana fifteen percent lower than the consumer network with a result of score of 1.1. Docket No. 105-15.

85. The April 22, 2014 letter stated that Mr. Santana was still not complying with Norm 27 of the Employee Manual. Docket No. 105-15.

86. Mr. Santana discussed these results with Ms. Mejias. Docket No. 89-14 at 54-57.

87. On June 2, 2014, Santana signed a monthly follow-up of the PIP for April 2014. Docket Nos. 89-4 at 58-61; 105-16.

88. The June 2, 2014 monthly follow-up letter reflected that Mr. Santana got a score of 1.0 for April 2014 and was not in compliance the minimum score the March 2014 PIP required. Docket Nos. 89-4 at 58-61; 105-16.

89. The monthly follow-up letter also shows the results for the months of January 2014 (2.1), February 2014 (1.3) and March 2014 (1.1). Docket Nos. 89-14 at 59; 105-16.

90. Mr. Santana discussed these results with Mr. Mejias. Docket No. 89-14 at 164-67.

91. On June 30, 2014, Mr. Santana signed a monthly follow-up of the PIP for May 2014. Docket No. 105-17.

92. The June 30, 2014, monthly follow up letter reflects that Mr. Santana got a score of 1.0 for the month of May 2014 and was not in compliance with the March 2014 PIP. Docket No. 105-17.

93. Mr. Santana discussed these results with Ms. Mejias. Docket No. 89-14 at 61-62.

94. The June 2014 scorecard for the Utuado branch reflected an improvement with a result of 2.5. Docket No. 89-2 at 6.

95. However, the June 2014 score was still below the expected performance level of 2.65. Docket No. 105-12.

VIII.   **Mr. Santana's Termination and Replacement**

96. Santander Financial evaluated Mr. Santana's performance for 2011, 2012, 2013 and the first half of 2014. Docket Nos. 105-12; 105-18; 105-22 at 27.

97. Santander Financial found that Mr. Santana had not met the expected performance levels. Docket No. 105-22 at 27-28.

98. On August 8, 2014, Mr. Santana was terminated from his employment at Santander Financial by Manuel A. Frias ("Mr. Frias") and Ms. Mejias. Docket Nos. 89-14 at 65-68; 105-18.

CIVIL NO. 15-1521 (JAG)                                                                 15

99. Mr. Santana received and signed the letter of termination, which states that his termination was due to his poor performance and his failure to achieve the goals in the PIP. Docket No. 105-18.

100.     Mr. Santana was forty-nine years old when he was terminated. Docket 127-6 at 27.

101.  In September 2014, Marianela Matos ("Ms. Matos"), approximately thirty-two years-old, is promoted to branch manager and replaced Mr. Santana as the Utuado branch manager. Docket No. 105-23 at 2-3.

102.  For the first six months as branch manager, Ms. Matos had essentially the same personnel that Mr. Santana had under his supervision. Docket No. 105-23 at 16-17.

103.  Ms. Matos was able to achieve the business goals established for the Utuado branch. Docket No. 105-23 at 193-94.

104.  At the time of Mr. Santana's termination, there were forty-two branch managers out of the total fifty-five that formed part of the protected age class. Docket No. 89-11.

105.  Of those forty-two, ten branch managers were older than Mr. Santana. Docket no. 89-11.

IX.     **Similarly Situated Managers**

106.  Santander Financial also evaluated the performance of all other branch managers who were similarly situated to Mr. Santana, that is, those who had failed to comply with the expected performance for the past three years and the branch obtained a low scorecard. Docket No. 105-22 at 23-29.

107.  Grisel Velasco Pacheco ("Ms. Velasco"), a Branch Manager, had poor performance evaluations for the past three years and was placed in a PIP in April 2014 and given monthly follow ups. Docket Nos. 105-3; 105-4; 105-22 at 27-29.

CIVIL NO. 15-1521 (JAG)                                                                16

108. Ms. Velasco, forty-three years old, was terminated on August 8, 2014 for failure to achieve the expected performance during 2011, 2012, and 2013, and failure to comply with PIP. Docket Nos. 89-11; 105-3 at 18-21.

109. Rosalinda Ortiz Guzman ("Ms. Ortiz"), another branch manager at Santander Financial, did not comply with the expected performance level for 2013 and was placed in a PIP in 2014. Docket No. 105-7.

110. Ms. Ortiz, forty-three years old, left on medical leave in May 2014 and never returned to work. Docket Nos. 89-2; 89-11; 105-5.

111. Imitza Rivera ("Ms. Rivera"), another branch manager, had poor performance and was placed in a PIP during the last six months of 2014. Docket No. 127-13.

112. Ms. Rivera, forty years old, was given a six-month extension on her PIP. Docket No. 127-13.

X.   Age-Related Comments

113. On June 7th, 2013, Jeannette Villamil ("Ms. Villamil"), General Director, had a meeting with all branch managers. Docket No. 127-6 at 27.

114. At the meeting, Ms. Villamil expressed "you have been seeing that we are bringing young people to work with us, new blood, we want young people that accept changes." Docket No. 127-6 at 28.

115. Around April 2014, Ms. Mejias expressed to Mr. Santana that she wanted Ms. Lucy Torres, a sixty-one year old employee, to retire and leave Santander Financial. Docket Nos. 127-6 at 28; 127-4 at 18, 23.

CIVIL NO. 15-1521 (JAG)                                                                 17

## ANALYSIS

Mr. Santana argues that he was terminated by Santander Financial due to his age in violation of the Age Discrimination in Employment Act ("ADEA"). Docket No. 127. The Court disagrees.

I.   **ADEA**

Pursuant to the ADEA it is unlawful for an employer to "discharge any individual or otherwise discriminate . . . with respect to . . . terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). The Supreme Court of the United States has called the task of unmasking intentional discrimination as "elusive." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 n.8 (1981). As a result, courts have applied a burden-shifting framework to use when direct evidence of intentional discrimination is not available. *See Adamson v. Walgreens Co.*, 750 F.3d 73, 78 (1st Cir. 2014) (citations omitted); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).

In ADEA cases alleging discharge based on age, the first step of the *McDonnell Douglas* burden shifting framework requires the employee to establish a *prima facie* case by showing: "(1) that he [or she] was at least forty years old when he was fired; (2) that his [or her] job performance met the employer's legitimate expectations; (3) that he [or she] suffered an adverse employment action such as a firing; and (4) that the employer filled the position, thereby showing a continuing need for the services that he [or she] had been rendering." *Melendez v. Autogermana, Inc.*, 622 F.3d 46, 50 (1st Cir. 2010) (citations omitted). Compliance with this initial showing gives the employee's case a rebuttable presumption of discrimination and shifts the burden of production, but not persuasion, to the employer to articulate a legitimate, non-discriminatory reason for the adverse

CIVIL NO. 15-1521 (JAG)                                                                18

employment action. *See Del Valle-Santana v. Servicios Legales De Puerto Rico, Inc.*, 804 F.3d 127, 130 (1st Cir. 2015).

If the employer can come up with a legitimate non-discriminatory reason for its actions, the presumption disappears, and the ball passes to the employee's side requiring him or her to prove that the employer's reasons are nothing but a pretext and "that age was the but-for cause of the employers adverse action." *Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 448 (1st Cir. 2009) (internal quotations marks and citations omitted). Below, the Court analyzes each step.

## A.   Step 1: *Prima Facie* Case

Santander Financial argues that Mr. Santana does not satisfy the second prong of the *prima facie* case.[2] The Court agrees.

The burden of proving *prima facie* case of discrimination is not particularly onerous. *See Caraballo-Caraballo v. Corr. Admin.*, 892 F.3d 53, 57 (1st Cir. 2018). It can be satisfied by a small showing that is easily made. *Id.* (internal quotation marks and citations omitted). To establish the second prong of a *prima facie* case of a discharge ADEA case, an employee has to show that his or her job performance meets the employer's legitimate expectations. *Webber v. Int'l Paper Co.*, 417 F.3d 229, 234 (1st Cir. 2005). Although the burden here is low, an employee must still put forth minimal evidence to show that he or she met the employer's expectations. *Id.*

In line with the low *prima facie* bar, the First Circuit has warned not to use an employer's legitimate non-discriminatory reason to terminate an employee to analyze whether that

---

[2] The parties do not argue over prongs one, three, and four of the Mr. Santana's ADEA *prima facie* case. Thus, the Court focuses its analysis on prong number two.

CIVIL NO. 15-1521 (JAG)                                                                    19

employee's job performance met the employer's legitimate expectation. *Autogermana, Inc.*, 622 F.3d at 51 (noting that a court "cannot consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the *prima facie* case.") (internal quotation marks and citation omitted). The First Circuit has also noted that because *McDonnell Douglas* framework was created to be applied to a variety of scenarios, proving a *prima facie* case under that framework was "never intended to be rigid, mechanized, or ritualistic." *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 154 (1st Cir. 1990) (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

Given this fluidity and the variety of cases that the *McDonnell Douglas* framework is used in, a principle established in one case might not always translate to another. *Caraballo-Caraballo*, 892 F.3d at 59. For example, in failure to promote and hire cases, the plaintiff is ordinarily competing for an open position. *Id.* In those cases, courts assess the plaintiff's qualification considering the employer's job requirements. *Id.* On discharge or transfer cases, however, the employer has expressed that the plaintiff is minimally qualified by previously hiring the employee. *Id.* In the latter case, such as this one, courts consider the employee's ability to satisfy the *prima facie's* second prong by determining whether he or she has been "successfully performing her job at the time of [his or] her discharge or transfer, such that [he or] she did not disqualify [himself or] herself by performing poorly." *Id.* (citations omitted).

In this case, Mr. Santana has failed to show that he met Santander Financial's legitimate expectations for the position of branch manager by his long history of unsatisfactory performance. A brief venture into his performance history with Santander Financial shows how.

CIVIL NO. 15-1521 (JAG)                                                    20

Mr. Santana started working for Santander Financial after it purchased Island Finance in

2006. Docket Nos. 89-14 at 25-26; 105-24 at 47. After Santander Financial's acquisition of Island

Finance, Mr. Santana retained the position of branch manager and worked at the Ciales and

Utuado branches. Docket Nos. 127-6 at 21; 127-4 at 125.

Mr. Santana's negative performance started when he was branch manager of the Ciales

branch in 2009. After his arrival at the Ciales branch Mr. Santana received a memorandum stating

that his results were not acceptable and that his bad performance compromised the permanence

of his position. Docket No. 105-10. Mr. Santana was transferred back to the Utuado branch in 2010

where he got another memorandum stating that his results were not acceptable and that those

results compromised his position at Santander Financial. Docket No. 105-11. In that same

memorandum, Mr. Santana was placed on a Performance Improvement Plan for ninety days. *Id.* In

2011, Mr. Santana received another unsatisfactory evaluation by getting a 2.05[3] in a performance

evaluation. Docket No. 111-1. In 2012, Mr. Santana received below acceptable evaluations by his

supervisor. Docket No. 105-13. In 2013, Mr. Santana received another unsatisfactory review.

Docket No. 105-14. As a result of his continuous unsatisfactory performance and in an effort to

help him, Mr. Santana was sent to commercial school in December 2013. Docket No. 105-24 at 16-

17.

On March 21, 2014, Mr. Santana received a letter stating that he had not met the

established objectives for his position in line with Norm 27 of the Employee Manual due to his

_____

[3] The record shows that Santander Financial evaluated employees using a point system from one to five
(one being the lowest and five being the highest) in their performance evaluations. Branch managers are
evaluated using a myriad of factors and objectives each receiving its own one to five score. Docket Nos.
105-13; 105-14. After each factor and objective are given a score, the supervisor adds the scores to form an
overall score. *Id.* The evaluation form also includes a section that lists the employee's strengths and areas
of improvement as well as any comments the employee might have. *Id.*

low performance scores at the beginning of 2014 and overall unsatisfactory performance in the last three years. Docket No. 105-12. The letter informed Mr. Santana that he was again placed in a PIP.[4] *Id.* He was also informed that his performance would be evaluated monthly for a period of six months. *Id.* The letter stated that the expected performance should surpass 2.65 of the possible five. *Id.*

On a meeting held on April 7, 2014, Ms. Mejias, the district manager and Mr. Santana's direct supervisor, informed him that the numbers for the Utuado branch were far below expected placing him in violation of Norms 9, 27 and 29 of the Employee Manual. Docket No. 105-21. On April 22, 2014, Mr. Santana was given yet another poor evaluation as part of his PIP monthly follow-up for March 2014. Docket No. 105-15. On June 2, 2014, Mr. Santana was given another poor score as part of his PIP monthly follow up for April 2014 receiving a one out of possible five. Docket No. 105-16. On June 17, 2014, Mr. Santana received another poor evaluation as part of his PIP monthly follow-up for May 2014. Docket No. 105-17. According to Santander Financial's monthly statistics, the Utuado branch improved its performance to 2.50 for the month of June 2014, Docket No. 89-2 at 5, but was still under the expected performance of 2.65 as agreed on Mr. Santana's 2014 PIP, Docket No. 105-12.

As shown above, Mr. Santana failed to complete his job duties and responsibilities. On February 2, 2012, Mr. Mario Enrique Delgado Mateu, Satander Financial's president at that time, sent a letter to Mr. Santana listing all his job duties and responsibilities that he had as a branch manager. Docket No. 105-9. Mr. Santana's job responsibilities included among other things "the

---

[4] The issue of when the PIP was initiated is contested. *Compare* Docket No. 89 at 6 (PIP started in January 2014) *with* Docket No. 127 at 4 (PIP started in April 2014). That the issue is contested does not change the ultimate conclusion in the Court's analysis.

administration and management of the branch's portfolio, supervision of resources, and coordination of the budget implementation and achieve sales and collection goals assigned by the company . . . in order to maximize the financial environment and attend to the interests of the company," as listed on the 2012 letter. *Id.* On that letter, Mr. Delgado also informed Mr. Santana that among his responsibilities he needed "[t]o guarantee achieving the branch's sales goal, within the volume of business expected, and to ensure that [sic] these through the increase in accounts." *Id.* at 1.

Due to his continued low performance scores and two PIPs, Mr. Santana was not complying with the job duties and responsibilities of a Santander Financial branch manager as explained in the 2012 letter. Moreover, Mr. Santana does not argue to the contrary. Mr. Santana does not put forth evidence that he was complying with the legitimate job performance expectations for his position as listed in the Employee Manual or the letter sent by Santander Financial's president. Thus, the Court finds that Mr. Santana has not shown he was meeting Santander Financial's legitimate job performance expectations.

The fact that Mr. Santana has been employed in Island Finance since June 30, 1986, Docket No. 89-14 at 25-26, and a branch manager since 2001, by itself is not probative that he was meeting Santander Financial's legitimate job expectations. *Cf. Velez*, 585 F.3d at 448 (legitimate expectations prong met where plaintiff relied on his twenty-four years of employment with defendant without being subject to discipline due to his performance). Typically, courts find that an employee has met an employer's legitimate job performance expectations when there is a long history of employment and whether at some point the employee has had a satisfactory performance. *See Autogermana, Inc.*, 622 F.3d at 51 (noting that because of plaintiff's ten-year career and his awards received in prior years, he had met the employer's legitimate job expectations); *see*

also *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1092 (1st Cir. 1995) (holding that a history of substantial wage increases and ten years of positive performance reviews met the legitimate job-performance expectation prong).

Here, Mr. Santana did not have a long unblemished record of employment. To the contrary, since 2009 he was being counseled for not complying with Santander Financial's minimum goals and expectations. Furthermore, that he was employed as a branch manager before termination is not probative that he met the Santander Financial's legitimate job performance expectations. *Cf.* *Caraballo-Caraballo*, 892 F.3d at 59 (noting that "[i]n discharge or transfer cases, however, the employer has already expressed a belief that [the plaintiff] is minimally qualified, by previously hiring the employee." (internal quotation marks omitted) (alterations in original)). In this case, Santander Financial did not hire Mr. Santana. The record shows Santander Financial acquired Island Finance in 2006, at which time Mr. Santana was already a branch manager. Thus, Santander Financial cannot be imputed with the decision of hiring Mr. Santana, and thus, assuming that because he was hired and kept after Island Finance's acquisition, he was meeting Santander Financial's legitimate job expectations.[5] Santander Financial's job expectations for a branch manager were directly conveyed to Mr. Santana and he chose not to act upon them at his own peril.

Accordingly, Mr. Santana fails to satisfy the second prong of his ADEA *prima facie* case. Out of an abundance of caution, and assuming *arguendo* that Mr. Santana proved his *prima facie* case, the

---

[5] Perhaps Island Finance before being acquired by Santander Financial had different job expectations or evaluation matrix.

CIVIL NO. 15-1521 (JAG)                                                                24

Court finds that Santander Financial had a legitimate non-discriminatory reason to terminate his employment.

**B. Step 2: Employer's Legitimate Non-Discriminatory Reason**

After establishing a *prima facie* case of age discrimination under the ADEA, the burden of production shifts to the employer to provide a legitimate, non-discriminatory reason for termination. *Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 138 (1st Cir. 2012).

Here, Santander Financial produced substantial evidence that showed that its decision to terminate Mr. Santana was not based on his age. As stated above, Mr. Santana had a long history of unsatisfactory performance. Docket Nos. 105-10; 105-11; 105-12; 105-13; 105-14; 105-15; 105-16; 105-17; 105-18. Indeed, since 2009 up to his termination in 2014, Mr. Santana had not performed to the minimum requirements that Santander Financial required. Docket Nos. 105-12; 105-18. In an effort to improve his performance, Mr. Santana was twice put into a PIP. Docket Nos. 105-11; 127-4 at 29-30. During his last PIP, which lasted until August 2014, Mr. Santana could not raise his monthly performance above 2.65, the minimum score requirement for his position as stated in his 2014 PIP. Docket No. 105-12. On August, 8, 2014, after Mr. Santana was given ample time to improve, Santander Financial terminated him. Docket No. 105-18. Accordingly, Santander Financial provided a legitimate non-discriminatory reason of why it terminated Mr. Santana's employment namely—that he had been underperforming for years and was not showing an indicia of improvement before his termination.

Now that Santander Financial has articulated a legitimate non-discriminatory reason why it terminated Mr. Santana, Plaintiff has to prove "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Velez*, 585 F.3d at 447-48 (internal quotation marks and citations omitted).

## C. Step 3: Pretext

Mr. Santana argues that Santander Financial's reason for terminating him was pretextual and that its true motives were based on his age. The Court disagrees.

At this stage, the burden shifts to plaintiff to prove that the employer's proffered reason is pretext and that the true reason for terminating plaintiff was discriminatory animus. *Autogermana, Inc.*, 622 F.3d at 52. "In assessing pretext, a court's focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible." *Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 246 (1st Cir. 2006) (internal quotation marks and citations omitted). To show that the employer's legitimate reason is pretext, a plaintiff must do more than "impugn the veracity of the employer's justification; he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991) (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 9 (1st Cir. 1990)).

Mr. Santana puts forth several arguments that allegedly support the fact that Santander Financial's stated reasons for terminating him were pretextual. Among them, Mr. Santana argues by asking: (1) why exactly was Plaintiff abruptly terminated from his employment before the conclusion of the 6-month period expressly and clearly established for his performance improvement plan; (2) why did Defendants not comply with their own policies and rules regarding performance improvement plans; (3) why was Plaintiff substituted by a younger employee; (4) why was Plaintiff denied resources and those same resources were granted to his younger substitute and to younger managers; (5) why was Plaintiff treated differently from younger similarly situated employees, with similar performance record, who were not discharged from employment; (6) and why was Plaintiff subjected to age-based remarks that clearly showed

Case 3:15-cv-01521-JAG   Document 158   Filed 09/04/18   Page 26 of 37

CIVIL NO. 15-1521 (JAG)                                                                26

that age was a motivating factor for job-related decisions concerning Plaintiff. Docket No. 127 at

2-3. The Court finds that all these arguments, taken as whole, are not enough for a reasonable jury

to find that Santander Financial's legitimate non-discriminatory reasons were pretextual.[6]

**Santander Financial's Discharge Decision**

Summarizing and consolidating the first two claims, Mr. Santana argues that Santander

Financial failed to explain why it failed to follow its own PIP policies in its Employment Manual

by terminating him before the six month improvement schedule as stated in the 2014 PIP.[7] Docket

No. 127 at 11. Mr. Santana's argument seems to ask the right question without arguing an answer.

Nonetheless, the fact that Mr. Santana was terminated before the PIP allegedly ended, by itself, is

not indicative of age based discriminatory animus. The First Circuit has consistently held that

"mere questions regarding the employer's business judgment are insufficient to raise a triable issue

as to pretext." *Acevedo-Parrilla*, 696 F.3d at 140 (quoting *Webber*, 417 F.3d at 238 ("[A]n employee's

opinion of the efficacy of an employment decision, standing alone, cannot supplant the employer's

business judgment")).

Mr. Santana questions Santander Financial business decision to terminate him before the

conclusion of the time period in the PIP.[8] To that end, as stated above, Santander Financial has

---

[6] The Court groups and consolidates Mr. Santana's similar arguments together.

[7] This issue of when the PIP started running is contested. Mr. Santana argues that the PIP started in April 2014 when he received the performance evaluation letter, giving him until October 2014 to improve his performance. Docket No. 105-12. Santander Financial argues that the 2014 PIP started when Ms. Mejias counseled Mr. Santana in January 2014 giving Plaintiff until June 2014 to improve his performance. The Court notes that even assuming the PIP started in either date, there is still not enough evidence for a reasonable jury to infer that Santander Financial fired Mr. Santana because of his age.

[8] The Court notes that although Mr. Santana's March 2014 PIP was for six months, Santander Financial's policy on PIP allows the Director of human Resources to amend or modify the PIP policy's procedures, as business needs may require. Docket No. 105-1 at 5. Accordingly, it was within Santander Financial Director of Human Resource's discretion to cut short the six month time frame.

proffered various reasons for dismissing Mr. Santana, and at this juncture, without more evidence, the Court cannot supplant the employer's business judgment with an inference of discriminatory animus.[9] *See Mesnick*, 950 F.2d at 825 (1st Cir. 1991) ("The ADEA does not stop a company from discharging an employee for any reason (fair or unfair) or for no reason, so long as the decision to fire does not stem from the person's age." (internal quotations marks and citation omitted)).

Mr. Santana presses on and contends that a reasonable fact finder can make an inference of age based discrimination because he was being treated different than other managers and that his supervisors made hostile age based remarks.

Disparate Treatment

Mr. Santana argues that he was treated differently than other similarly situated employees because of his age. Specifically, Mr. Santana claims that around the same date he was terminated, other branches were doing as bad or worse than the Utuado branch and that none of the branch managers of those branches were terminated. Mr. Santana also argues that Santander Financial was taking employees away from the Utuado branch in order for Plaintiff to fail. Docket No. 127 at 25-26. The Court finds Mr. Santana's arguments unavailing.

---

[9] Questioning Santander Financial's decision not to wait until October 2014 to terminate Mr. Santana would be improper as any valid employment decision lies with the judgment of the employer and not with the Court. For example, Santander Financial could have understood, that the PIP started in January 2014 and terminated Mr. Santana based on an incorrect interpretation of the disciplinary procedures. Or perhaps Santander Financial thought it was futile to wait until October as increasing his performance in the last two months would not have led to a passing score as stated in the 2014 PIP. Santander Financial may have simply not wanted to wait and may have violated its own PIP. Whatever the case, the Court cannot act as a super personnel department and second guess Santander Financial's legitimate business decision to terminate Mr. Santana. *See Arroyo-Audifred v. Verizon Wireless, Inc.*, 527 F.3d 215, 221 (1st Cir. 2008) (However, courts in employment discrimination cases may not act as "super personnel departments," substituting judicial judgments for the business judgments of employers.).

Courts have held that "[a]n employer's disparate treatment of employees in response to behavior that legitimately offends the employer can provide evidence of discriminatory animus." *Vélez*, 585 F.3d at 451. However, "[t]o successfully allege disparate treatment, a plaintiff must show 'that others similarly situated to him in all relevant respects were treated differently by the employer.'" *Kosereis v. Rhode Island*, 331 F.3d 207, 214 (1st Cir. 2003) (quoting *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999)). "While an exact correlation is not necessary, the proponent must demonstrate that the cases are fair congeners." *Velez*, 585 F.3d at 451 (internal quotation marks and citation omitted).

Mr. Santana lists more than thirty employees that he claims were not in compliance with Santander Financial's goals, targets, and quotas and were not terminated at the time Mr. Santana was fired. Docket No. 127 at 23-24. However, Mr. Santana fails to explain each of the employees' circumstances and how they were similarly situated to Plaintiff at the time of his termination. Thus, without more, the Court cannot complete a disparate treatment analysis as to those employees and any arguments relating to them must be deemed waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones . . . Judges are not expected to be mindreaders . . . a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks and citations omitted)).

Mr. Santana goes into detail about one of those employees, however. Mr. Santana claims that Imitza Rivera Rosa was among the employees who were similarly situated to him and that she was not fired even though she was placed in a PIP and failed to comply with it, like Plaintiff. Docket No. 127 at 24. The record, however, is not fully developed as to the similarities between

CIVIL NO. 15-1521 (JAG)                                                                        29

Ms. Rivera and Mr. Santana. The Court found as undisputed that Ms. Rivera, around the time of Mr. Santana's termination, was a branch manager, had poor performance, and was placed in a PIP during the last six months of 2014. Docket No. 127-13. The record also shows that Ms. Rivera's PIP was extended because she had been working for Santander Financial for more than five years. *Id.* Mr. Santana argues that although he was similarly situated to Ms. Rivera, she was treated differently because she was not terminated after not complying with her PIP. Docket No. 127 at 24. Mr. Santana, like Ms. Rivera, had been working for Santander for more than five years before his termination. Docket No. 105-19. Mr. Santana claims that the difference in treatment was due to his age. Docket No. 127 at 24.

However, there are additional factors that need consideration before an inference of age discrimination can be made. First, the Court notes that Ms. Rivera's PIP has at least one month wherein she scored above expectations as compared to Mr. Santana's performance scores during the last months of his employment, which never surpassed the minimum requirement of 2.65. *Compare* Docket No. 127-13 *with* Docket Nos. 105-16; 105-17. Indeed, the record shows that in the last four years Mr. Santana has never surpassed the minimum score of 2.65. Additionally, Ms. Rivera's supervisor was not the same as Mr. Santana's. *Id.* This fact places Mr. Santana in a position dissimilar to Ms. Rivera in that Ms. Rivera's supervisor could very well have taken other factors into consideration when extending her PIP six more months. Finally, there is no record of Ms. Rivera's past performance before the PIP was established. This also points to dissimilarities between Ms. Rivera and Mr. Santana. For example, she could have been a stellar branch manager before her performance got worse in 2014. Perhaps this could have helped explain why Ms. Rivera's supervisor decided not to terminate her giving her one more chance and extending her

CIVIL NO. 15-1521 (JAG)                                                                          30

PIP six more months. Thus, as the record stands, the Court cannot determine that Ms. Rivera was similarly situated to Mr. Santana.

Santander Financial contends that it treated all similar situated managerial employees in the same fashion. Docket no. 89 at 10. Specifically, Santander Financial analyzed all other managers who were similarly situated to Mr. Santana's performance, and had failed to comply with the expected performance for the last three years. *Id.* There was one other branch manager that met that criteria: Grisel Velasco Pacheco. Like Mr. Santana Ms. Velasco was more than forty one years old, Docket No. 89 at 10, had been underperforming since at least 2011, Docket No. 105-3 at 6, and started her PIP in April 2014, *id.* Like Mr. Santana, Ms. Velasco received the same letter listing her responsibilities as branch manager. Docket No. 105-3 at 19. Ms. Velasco like Mr. Santana received monthly follow up evaluations where she scored below expectation in every single one. *Id.* at 8, 17, 16. Although her PIP started in April 2014, she was terminated on August 8, 2014, more than two months before the PIP's evaluation period. *Id.* at 18. Thus, at least one other branch manager with similar performance and results was terminated before the PIP period was over. As such, the Court finds that Santander did not treat Mr. Santana differently from other similar situated branch managers.

Mr. Santana also argues that Santander Financial transferred employees out of Mr. Santana's branches in an effort to make him fail. Docket No. 127 at 19, 26. Although Mr. Santana does not give an exhaustive list of the employees moved from the Utuado branch, he mentions at least one employee that was removed from his branch that he asked to be brought back: Brenda Marengo. Santander Financial, however, proffered a good reason to have her removed from the Utuado branch. The reason Ms. Marengo was transferred was because of a domestic violence incident that happened in the Utuado branch. Docket No. 139-7. After the incident, Ms. Marengo

CIVIL NO. 15-1521 (JAG)                                                                          31

was transferred to the Arecibo branch in accordance with Santander Financial policy and because of safety concerns. Docket No. 116-8 at 7. Evidently, Mr. Santana's request to bring Ms. Marengo back to the Utuado branch was unreasonable given the safety concerns. *Id.* As a result, Mr. Santana's request to transfer Ms. Marengo back to the Utuado branch was reasonably denied.[10] Thus, the Court cannot attach discriminatory animus to Santander Financial's relocation decision.

Age-Based Remarks

Finally, Mr. Santana argues that he was subjected to age based remarks that give rise to an inference that he was terminated based on his age. The Court disagrees.

"It is settled that statements made by decisionmakers can evidence age discrimination," *Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 347 (1st Cir. 1998). Mr. Santana argues that two statements by his supervisors prove that Santander Financial discriminated against people based on their age. Docket No. 127 at 18-19.

The first comment was made on June 7, 2013, by Ms. Jeanette Villamil, General Director of Santander Financial, who told the managers during a meeting held at the Santander Tower in San Patricio that "you have been seeing that we are bringing young people to work with us, we want young people, new blood, that accept changes, that go ahead, and that are not afraid." Docket No. 127-6 at 27–28.

---

[10] Mr. Santana further argues that Ms. Marengo was transferred back to the Utuado branch to help the current branch manager after he was terminated as evidence of discrimination against Plaintiff. Docket No. 127-25-26. Although Ms. Marengo was transferred back to Utuado, she was transferred almost two years after Mr. Santana was terminated from Santander Financial. Docket No. 105-23 at 15. Thus, given the substantial time between transfers, it is unreasonable to conclude that Santander Financial was waiting until Mr. Santana was terminated to bring back Ms. Marengo to help out the troubled branch. Thus the Court declines to give this event an inference of age based discriminatory animus against Mr. Santana.

CIVIL NO. 15-1521 (JAG)                                                                                        32

As to the first comment, the Court finds it does not carry an inference of age discrimination against Mr. Santana for three reasons. First, the comment was not directed at Mr. Santana; it was a general comment concerning hiring decisions that Santander Financial was making. Second, words of praise for youth are not evidence that Santander Financial wanted to get rid of its older workers. *Mesnick*, 950 F.2d at 826 ("Words of praise for youth . . . do not, by themselves, indicate a bias against more mature workers.") (collecting cases). Here, Ms. Villamil stated that she was bringing in young people who accept changes and touted this as a positive impact for the company. She, however, did not state she was getting rid of older employees, or that she was not going to hire older workers. Finally, the comment was made more than a year before Mr. Santana was terminated and by someone who the record does not show was an ultimate decisionmaker in his termination from Santander Financial. The First Circuit has noted that when evaluating disparaging remarks based on age made by a decisionmaker, courts need to consider "[the remarks] temporal proximity and causal connection to the decision to discharge." *Acevedo-Parrilla*, 696 F.3d at 144 (citation omitted). Here, the remark was made more than a year before Mr. Santana was terminated. In addition, the comment was made by someone who has not been shown to be a decisionmaker as to employment decisions in Santander Financial. Indeed, the supervisors who decided to terminate Plaintiff were Mr. Frias and Ms. Mejias, Mr. Santana's direct supervisor. Docket No. 105-18. Accordingly, the first remark by Ms. Villamil was not made with age-based discriminatory animus. *Autogermana, Inc.*, 622 F.3d at 54 (noting that "stray workplace remarks, as well as statements made either by non-decisionmakers or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus." (internal quotation marks and citation omitted)).

Likewise, the Court finds that the second comment cannot be given an inference of age based discrimination. The second comment was made by Ms. Mejias, the regional manager, and at the time Mr. Santana's direct supervisor, who stated that she wanted Lucy Torres, a sixty-one year old employee, to retire and leave Santander Financial.[11] Docket Nos. 127-6 at 28; 127-4 at 84, 89.

Similar to the first comment, the second comment was not directed at Mr. Santana.[12] The comment did not mention Ms. Torres's age or why Ms. Mejias wanted her to retire. Mr. Santana argues that Ms. Mejias wanted her to retire because she was old. Docket No. 127 at 18-19. However, given no basis to attach any improper inference to Ms. Mejias's statement, the Court will not create speculative inferences when determining if there is a disputed issue of material fact. *See Mesnick*, 950 F.2d at 826 (noting that "the district court was under no obligation to draw unreasonably speculative inferences in mulling whether the plaintiff fulfilled his burden of adducing specific facts showing that there is a genuine issue for trial." (internal quotation marks omitted)).[13]

---

[11] The Court notes that Mr. Santana asked Ms. Mejias and Mr. Pagani to transfer Ms. Torres to another branch. Docket No. 127-6 at 25.

[12] The Court notes, however, that to find an inference of discriminatory animus, comments made by a decisionmaker do not have to be directly addressed at a plaintiff as long as it disparages a protected class. *Mesnick*, 950 F.2d at 824 (noting that evidence that may show that the employer's reason is a pretext for age discrimination can include "comments by decisionmakers which denigrate those over forty" (citations omitted)). The Court finds, nonetheless, that Ms. Mejias comments were not made with age-based discriminatory animus.

[13] That is not to say that the Court is not taking all the inferences in Mr. Santana's favor. Here, in order to create a disputed issue of material fact, the Court would have infer that the only reason Ms. Mejias made the comment about Ms. Torres was because of her age. That would be a misapplication of the summary judgment standard as it would cherry pick a possible reason as to why Ms. Mejias disliked Ms. Torres out of a universe of reasons. Additionally, it is the non-movant's duty to make an argument as to why an inference of age based discriminatory animus should be attached to Ms. Mejias' comment. No argument to that effect was made by Mr. Santana.

CIVIL NO. 15-1521 (JAG)                                                                34

Accordingly, Mr. Santana has not proffered enough evidence for a rational fact finder to establish that Santander Financial's legitimate nondiscriminatory reasons to terminate Plaintiff were pretextual.

### D. Hostile Work Environment

Mr. Santana argues that he was subjected to a hostile work environment because his supervisors: 1) made age-related derogatory comments; 2) regularly harassed him and requested him to resign; and 3) denied him the appropriate tools and personnel to achieve the Santander Financial's goals, quotas, and objectives. Docket No. 127 at 16. The Court finds that Mr. Santana's supervisors did not create an environment permeated with pervasive intimidation, ridicule, or insult that amounted to a hostile environment.

"To prove a hostile-work-environment claim, a plaintiff must provide sufficient evidence from which a reasonable jury could conclude that the offensive conduct is severe and pervasive enough to create an objectively hostile or abusive work environment and is subjectively perceived by the victim as abusive." *Rivera-Rodriguez v. Frito Lay Snacks Caribbean, a Div. of Pepsico P.R., Inc.*, 265 F.3d 15, 24 (1st Cir. 2001) *abrogated on other grounds by Crowley v. L.L. Bean, Inc.*, 303 F.3d 387 (1st Cir. 2002). In other words, Mr. Santana had to show that his "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of . . . [his] employment and create an abusive working environment." *Quiles-Quiles v. Henderson*, 439 F.3d 1, 7 (1st Cir. 2006) (citations omitted) (alterations in original). Determining if a defendant created a hostile work environment cannot be a precise test and "can be determined only by looking at all the circumstances." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-23 (1993). The First Circuit has determined that these circumstances could be, but are not limited to: "the

CIVIL NO. 15-1521 (JAG)                                                                         35

frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." *Rivera-Rivera v. Medina & Medina, Inc.*, No. 17-1191, 2018 WL 3640821, at \*6 (1st Cir. Aug. 1, 2018) (quoting *Pomales v. Celulares Telefónica, Inc.*, 447 F.3d 79, 83 (1st Cir. 2006)).

Here, Mr. Santana's supervisors did not create an environment where Plaintiff could not work in peace. A hostile environment claim revolves around the pervasiveness of the discriminatory conduct. In other words, the conduct has to be continuous and to such an extent that the employee's work performance would be affected. *See Rivera-Rivera*, 2018 WL 3640821, at \*6. As shown above, the Court has determined that there was no discriminatory conduct. However, even if Mr. Santana's supervisors' conduct could be said to be discriminatory, it would not create a hostile work environment for Plaintiff.

First, the supervisors' alleged two age based remarks were not sufficiently pervasive, abusive, or insulting to create an environment that unreasonably interfered with Mr. Santana's work performance. Mr. Santana alleges a third discriminatory comment made on May 16, 2013, whereby Mr. Fredy Molfino, Island Finance's president, asked him to resign. Docket No. 127 at 16-17. This, however, was done outside of the presence of other people, and Mr. Molfino followed up stating that he would consider offering Mr. Santana a new job as an auditor. *Id.* This comment was made back in 2013 at a time when Mr. Santana was in his fourth year of unsatisfactory performance for his position at Santander Financial. Thus, the Court finds that there was no

hostility, intimidation, or insult when Mr. Molfino privately asked an unsatisfactory performing employee to resign from a managerial position.[14]

Second, Mr. Santana's supervisors did not deny him of the tools to accomplish his goals as a branch manager. To the contrary, Santander Financial gave Mr. Santana more than four years to improve. Indeed, in December 2013, in an effort to improve his performance, Santander Financial sent Mr. Santana to commercial school. Docket No. 105-24 at 16. Thus, Mr. Santana has not put forth enough evidence upon which a reasonable factfinder could determine that Santander Financial's work environment was pervasively hostile.

## II.   State Law Claims

Given that all federal claims have been **DISMISSED** *with prejudice*, the Court declines to adjudicate Mr. Santana's supplemental state law claims. *Camelio v. Am. Fed'n*, 137 F.3d 666, 672 (1st Cir. 1998) ("If . . . the court dismisses the foundational federal claims, it must reassess its jurisdiction, this time engaging in a pragmatic and case-specific evaluation of a variety of considerations that may bear on the issue."). Thus, Mr. Santana's state law claims are **DISMISSED** *without prejudice*.

---

[14] Mr. Santana verbally complained to Ms. Guzman at Santander's Human Resources department. Docket 127-4 at 12-14. Mr. Santana, however, did not mention age-based animus when complaining about Mr. Molfino's comments. *Id.*

CIVIL NO. 15-1521 (JAG)                                                                                    37

For the reasons stated above, Mr. Santana's ADEA claims based on disparate treatment and hostile work environment are **DISMISSED** *with prejudice*. Mr. Santana's state law claims are **DISMISSED** *without prejudice*.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this Tuesday, September 04, 2018.

<u>s/ Jay A. Garcia-Gregory</u>
JAY A. GARCIA-GREGORY
United States District Judge

---

[15] Because the Court dismisses the ADEA claims against Santander Financial, we also decline to address whether Banco Santander and Santander Financial are to be treated as a joint employer for purposes of liability.